[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-15258
_____

D.C. Docket No. 6:11-cv-01473-MSS-DAB

LUIS W. LEBRON,
Individually and as Class Representative,

Plaintiff–Appellee,

versus

SECRETARY, FLORIDA DEPARTMENT OF
CHILDREN AND FAMILIES,

Defendant–Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(February 26, 2013)

Before BARKETT and JORDAN, Circuit Judges, and HALL,[*] District Judge.

BARKETT, Circuit Judge:

_____

* Honorable James Randal Hall, United States District Judge for the Southern District of Georgia, sitting by designation.

The Secretary of the Florida Department of Children and Families ("State") appeals from the district court's order enjoining the State of Florida from requiring Luis W. Lebron to submit to a suspicionless drug test pursuant to Section 414.0652 of the Florida Statutes, as a condition for receipt of government-provided monetary assistance for which he was otherwise qualified.

Lebron is an honorably discharged veteran of the United States Navy, college student, single unmarried father and sole caretaker of his young child. Lebron resides with and also cares for his disabled mother, who subsists on Social Security Disability benefits.  In July 2011, Lebron applied for financial assistance benefits for himself and his son through Florida's Temporary Assistance for Needy Families program ("TANF"), which, if he were eligible, would have provided him with a maximum of $241 per month to assist in the support of himself and his child.

TANF is a block grant program in which the federal government provides states with funds to assist needy families with short term financial assistance and with finding employment.  The State, through the Department of Children and Families ("DCF"), has been administering the TANF program since its creation as part of the Personal Responsibility and Work Opportunity Reconciliation Act in 1996.  Lebron met all of the program's eligibility requirements, but DCF ultimately denied his application because Lebron refused to submit to Florida's

2

newly-enacted, mandatory drug testing, which is a final condition of eligibility for TANF benefits in Florida.

Florida's mandatory drug-testing requirement for all TANF applicants was enacted in May 2011. See Fla. Stat. § 414.0652 (2011). Under the statute, when an individual applies, he is notified that he will be required to submit to and pay for drug testing as a condition of receiving TANF benefits. Id. § 414.0652(2)(a). If the applicant submits to the drug testing and tests negative, the cost of the test will be reimbursed to the applicant through a one-time increase in his TANF benefits. Id. If the applicant tests positive for controlled substances, he is ineligible to receive TANF benefits for one year, id. § 414.0652(1)(b), but can reapply in six months if he completes a substance abuse treatment program and passes another drug test, both at his own expense, id. § 414.0652(1)(j). Although an adult applicant who fails the drug test is ineligible for TANF benefits, the applicant's dependent child may still receive TANF benefits so long as the adult designates an appropriate protective payee to receive the child's benefits. Id. § 414.0652(3). However, the individual who wishes to serve as the protective payee must also submit to and pass mandatory drug testing to receive benefits for the child, even though he is not requesting any TANF benefits for himself. Id. § 414.0652(3)(c).

In addition to the mandatory drug test, applicants are required to sign a release acknowledging their consent to be tested. Id. § 414.0652(2)(e). At the

3

time Lebron applied for TANF benefits, he was notified of Florida's mandatory drug testing requirement and that he was required to sign the release before DCF would allow him to proceed with the application process. Lebron signed the release, completed the application process and was found eligible for TANF benefits. However, he did not submit to the drug test, but instead filed this lawsuit seeking to enjoin the enforcement of Florida's mandatory suspicionless drug testing as a violation of his and all other TANF applicants' Fourth Amendment right to be free from unreasonable searches and seizures. The district court granted a preliminary injunction against the enforcement of the drug testing statute against Lebron and the State agreed to discontinue its drug testing regime as to all TANF applicants until this litigation is fully resolved.

## I.    Standard of Review

Although we review the district court's grant of a preliminary injunction for an abuse of discretion, underlying questions of law are reviewed de novo, and the district court's factual determinations cannot be disturbed unless clearly erroneous, see United States v. Alabama, 691 F.3d 1269, 1281 (11th Cir. 2012). To grant a preliminary injunction, the district court must determine that the moving party has established: "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction is issued; (3) the threatened injury to the moving party outweighs whatever damage the proposed injunction

4

might cause the non-moving party; and (4) if issued, the injunction would not be adverse to the public interest." Keeton v. Anderson-Wiley, 664 F.3d 865, 868 (11th Cir. 2011). Here, the State challenges only the district court's conclusion that Lebron has shown a "substantial likelihood of success on the merits" of his claim that Florida's mandatory suspicionless drug testing of TANF applicants violates his Fourth Amendment right against unreasonable searches. Accordingly, in reviewing the district court's grant of the preliminary injunction, we do not resolve the merits of the constitutional claim, but instead address whether the district court abused its discretion in concluding that Lebron is substantially likely to succeed in establishing that Florida's drug testing regime for TANF applicants violates his Fourth Amendment rights.

## II.    Discussion

The Fourth Amendment protects the rights of individuals "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.   It is undisputed and well-established that government-mandated drug testing is a "search" within the meaning of the Fourth Amendment.   See e.g., Bd. of Educ. v. Earls, 536 U.S. 822, 828 (2002); Chandler v. Miller, 520 U.S. 305, 313 (1997); Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 652 (1995); Nat'l Treasury Emps. Union v. Von Raab, 489 U.S. 656, 665 (1989); Skinner v. Ry. Labor Execs.' Ass'n, 489 U.S. 602, 614–15 (1989).   Thus,

5

the question before us is whether Florida's mandatory, suspicionless drug-testing of all TANF applicants is a constitutionally reasonable search under the Fourth Amendment.  See Skinner, 489 U.S. at 618–19 ("To hold that the Fourth Amendment is applicable to . . . drug and alcohol testing . . . is only to begin the inquiry into the standards governing such intrusions.").

Ordinarily, to be reasonable, a search must be based on individualized suspicion of wrongdoing.  See e.g., Chandler, 520 U.S. at 308 ("[The Fourth Amendment's] restraint on government conduct generally bars officials from undertaking a search or seizure absent individualized suspicion.").  In most cases, this standard is met only when a search "is accomplished pursuant to a judicial warrant issued upon probable cause."  Skinner, 489 U.S. at 619.

However, the Supreme Court has upheld as reasonable searches without a showing of individualized suspicion in certain very limited and exceptional circumstances.  See New Jersey v. T.L.O., 469 U.S. 325, 351 (1985) (Blackmun, J., concurring in judgment) (explaining that a court may substitute its own reasonableness balancing for that of the Fourth Amendment's warrant and probable cause requirement only in those "exceptional circumstances" where special needs have been established).  But to establish these limited and exceptional circumstances that justify the suspension of Fourth Amendment protections, the Supreme Court has required the government to make a threshold

showing that there are "special needs, beyond the normal need for law enforcement, [which] make the warrant and probable-cause requirement impracticable." Skinner, 489 U.S. at 619 (internal quotation omitted).[1] Not only must the government identify the special needs that make the warrant and probable-cause requirement impracticable but it must establish that those special needs are "substantial." See Chandler, 520 U.S at 318 ("Our precedents establish that the proffered special need for drug testing must be substantial."). Only if the government is able to make a showing of substantial special needs will the court thereafter "undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties," to determine the reasonableness of the search. Id. at 314; see also T.L.O., 469 U.S. at 351

---

[1] The origins of the Court's "special needs" test has been summed up as follows:

> The term "special needs" first appeared in Justice Blackmun's opinion concurring in the judgment in New Jersey v. T.L.O., 469 U.S. 325, 351 (1985). In his concurrence, Justice Blackmun agreed with the Court that there are limited exceptions to the probable-cause requirement, in which reasonableness is determined by "a careful balancing of governmental and private interests," but concluded that such a test should only be applied "in those exceptional circumstances in which special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable. . . ." This Court subsequently adopted the "special needs" terminology in O'Connor v. Ortega, 480 U.S. 709, 720 (1987) (plurality opinion), and Griffin v. Wisconsin, 483 U.S. 868, 873 (1987), concluding that, in limited circumstances, a search unsupported by either warrant or probable cause can be constitutional when "special needs" other than the normal need for law enforcement provide sufficient justification.

Ferguson v. City of Charleston, 532 U.S. 67, 76 n.7 (2001).

(Blackmun, J., concurring in judgment) (explaining that the reasonableness balancing test should be applied only if special needs have been established).

In the specific context of government-mandated drug testing programs, the Supreme Court has exempted such programs from the Fourth Amendment's warrant and probable cause requirement only where such testing "fit[s] within the closely guarded category of constitutionally permissible suspicionless searches." Chandler, 520 U.S. at 309. To fall within this "closely guarded category," the Court has made clear that its "precedents establish that the proffered special need for drug testing must be substantial." Id. at 318. The Court has recognized two concerns that present such "exceptional circumstances," which are sufficiently "substantial" to qualify as special needs meriting an exemption to the Fourth Amendment's warrant and probable cause requirement: the specific risk to public safety by employees engaged in inherently dangerous jobs and the protection of children entrusted to the public school system's care and tutelage. In contrast, this "closely guarded category" does not include a policy requiring candidates for public office to submit to drug testing because the Court concluded that the state's asserted need to "signify that candidates, if elected, will be fit to serve their constituents free from the influence of illegal drugs" was merely "symbolic" and

8

not substantially special to warrant an exemption from the Fourth Amendment.[2] Id. at 321–22.

With reference to ensuring public safety in well-defined circumstances, the Court, in Skinner and Von Raab, recognized a special need where "[railroad] employees are engaged in safety-sensitive tasks," Skinner, 489 U.S. at 620, and where the "sensitive positions" of certain United States Customs employees present "extraordinary safety and national security hazards," Von Raab, 489 U.S. at 666, 674.

In Skinner, the Court permitted mandatory drug testing of railroad employees involved in train accidents under a program that had been implemented in response to "evidence indicating that on-the-job intoxication was a significant problem in the railroad industry" and that alcohol or drug use was a factor in several accidents that resulted in numerous fatalities, other injuries and property damage.  489 U.S. at 607.  Given the "safety-sensitive tasks" that the railroad employees engaged in, the Court determined that the government presented a

---

[2] We also note that the Supreme Court in Ferguson struck down as unconstitutional a state hospital policy of drug testing pregnant women who medical staff considered to be potential cocaine users.  532 U.S. at 86. The Court, however, distinguished the testing regime in Ferguson from its prior drug testing cases because the program was established in conjunction with law enforcement officials so that test results could be turned over for criminal prosecution.  532 U.S. at 84 ("Given the primary purpose of the Charleston program, which was to use the threat of arrest and prosecution in order to force women into treatment, and given the extensive involvement of law enforcement officials at every stage of the policy, this case simply does not fit within the closely guarded category of special needs.").  The Court also noted that the privacy interests were much greater in Ferguson than its other drug testing cases.  Id. at 78.

special need of "ensuring the safety of the traveling public and of the employees themselves" which justified a policy prohibiting the use of alcohol or drugs while on duty. Id. at 620–21. Having found that the government established "special needs," the Court went on to weigh the government's need to "monitor compliance with the[ ] restrictions" of on-the-job drug and alcohol use against the privacy interests of the railroad employees. Id. at 621. The Court explained that the government had a compelling interest in drug testing because "[e]mployees subject to the tests discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences. . . . [They] can cause great human loss before any signs of impairment become noticeable to supervisors or others." Id. at 628. On the other hand, railroad employees' "expectations of privacy . . . are diminished by reason of their participation in an industry that is regulated pervasively to ensure safety, a goal dependent, in substantial part, on the health and fitness of covered employees." Id. at 627.

In Von Raab, the Court likewise sustained a United States Customs Service policy that made drug tests a condition of working in positions directly involving drug interdiction or requiring the employee to carry a firearm. 489 U.S. at 660–61. The Court pointed out that the Customs Service, in performing its "almost unique mission," id. at 674, was our "first line of defense against . . . the veritable national crisis in law enforcement caused by smuggling of illicit narcotics," id. at 668, and

10

that "[m]any of the Service's employees are often exposed to this criminal element and to the controlled substances it seeks to smuggle into the country," id. at 669.[3] As a result, our "national interest in self-protection could be irreparably damaged" if Customs' employees' performance on the job was impaired by drug use. Id. at 670. The Court also noted that "Customs employees who may use deadly force plainly 'discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences.'" Id. at 670 (quoting Skinner, 489 U.S. at 628). Thus, given the substantial danger of physical harm, threat to national security, and numerous temptations inherent in the affected positions involved in the interdiction of drugs being smuggled into the country, the Court agreed that the government demonstrated a special need in ensuring against the creation of such risks within the Customs Service. Id. at 670–71.

Having found a substantial special need, the Court, in the subsequent weighing of the competing government and individual interests, determined that affected Customs' employees, like the railroad workers in Skinner, have a diminished expectation of privacy with respect to the intrusions occasioned by the tests administered. "Unlike most private citizens or government employees in general, employees involved in drug interdiction [and those who carry firearms]

---

[3] As an example of the sort of illicit temptation potentially faced by Customs' employees, the Court noted that "Customs officers have been the targets of bribery by drug smugglers on numerous occasions, and several have been removed from the Service for accepting bribes." Von Raab, 489 U.S. at 669.

reasonably should expect effective inquiry into their fitness and probity. . . . [T]hese employees cannot reasonably expect to keep from the Service personal information that bears directly on their fitness." Id. at 672.

Other than the certain well-defined public safety concerns, the "closely guarded category" includes suspicionless drug testing only in one other context— the public school setting. In Vernonia and Earls, the Court upheld as reasonable under the Fourth Amendment school district policies that provided for random drug testing of public school children who participated in the school systems' athletics programs and non-athletic extracurricular activities, respectively. The Court noted that "'special needs' inhere in the public school context," Earls, 536 U.S. at 829, given the need for "swift and informal disciplinary procedures" and "the substantial need of teachers and administrators for freedom to maintain order in the schools." Vernonia, 515 U.S. at 653 (quoting T.L.O., 469 U.S. at 340–41). The Court also explained that schools have an important concern with deterring drug use by schoolchildren "for whom it has undertaken a special responsibility of care and direction." Vernonia, 515 U.S. at 662; Earls, 536 U.S. at 834.

In Vernonia, in permitting the drug testing of student athletes, the Court emphasized the findings that "athletes were the leaders of the drug culture" in this school district, which was fueling a "rebellion" that led to an increase in disciplinary problems that "had reached epidemic proportions." 515 U.S. at 649,

12

663.  The deleterious effects of drug use were of particular concern in the specific context of student athletics, which the Court noted "increases the risk of sports-related injury" and affects "motivation, memory, judgment, reaction, coordination, and performance."  Id. at 649.  Likewise in Earls, the Court reiterated "the importance of the governmental concern in preventing drug use by schoolchildren" and determined that the "health and safety risks identified in Vernonia" applied with "equal force" in the context of school children participating in extracurricular activities.  536 U.S. at 834.[4]

In both Vernonia and Earls, the government's special need in the unique context of the public school setting was found to outweigh the individual privacy rights of the students—rights which the Court concluded are "limited in a public school environment where the State is responsible for maintaining discipline, health, and safety."  Earls, 536 U.S. at 830; see also Vernonia, 515 U.S. at 656 ("Fourth Amendment rights . . . are different in public schools than elsewhere[.]").  Although the Court in both Vernonia and Earls had before it evidence of a genuine drug problem among the covered students, the Court cautioned that "[t]he most significant element . . . is . . . that the Policy was undertaken in furtherance of the

_____

[4] We note that in both Vernonia and Earls, the Court acknowledged that the school districts had presented specific evidence of drug use by the relevant population of students and that the Court would not "second-guess the finding of the district court that . . . the [School District] was faced with a 'drug problem' when it adopted the policy."  Earls, 536 U.S. at 834.

13

government's responsibilities, under a public school system, as guardian and tutor of children entrusted to its care." Vernonia, 515 U.S. at 665.

Thus in the context of government mandated drug testing, when the Court has permitted the suspension of the Fourth Amendment protections requiring individualized suspicion it has done so only in the "closely guarded categor[ies]" enumerated above where the asserted special need addresses a substantial concern for public safety or where the state is fulfilling its well-recognized role as the guardian and tutor of public school children. That is not to say that there cannot be other governmental needs that are sufficiently substantial to qualify as a special need for Fourth Amendment purposes. Moreover, in subsequently weighing the competing government and individual interests, the Court has noted that the affected individuals have a diminished expectation of privacy given the nature of their employment or status as a public school student.

Conversely, in Chandler v. Miller, 520 U.S. 305 (1997), the Supreme Court rejected the state of Georgia's argument that it had a special need that supported the mandatory drug testing of all candidates for state public office. Georgia argued that unlawful drug use by elected officials "draws into question an official's judgment and integrity; jeopardizes the discharge of public functions[;] . . . and undermines public confidence and trust in elected officials." Chandler, 520 U.S. at 318. After distinguishing Skinner, Von Raab and Vernonia, the Court reiterated

14

that "[o]ur precedents establish that the proffered special need for drug testing must be substantial—important enough to override the individual's acknowledged privacy interest, sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized suspicion." Id. In concluding that Georgia's purported special needs were not substantial, the Court noted that Georgia failed to put forth "any indication of a concrete danger demanding departure from the Fourth Amendment's main rule." Id. at 319. ("Nothing . . . hints that the hazards [the State] broadly describe are real and not simply hypothetical for Georgia's polity."). Not only did Georgia fail to put forth "evidence of a drug problem among the State's elected officials," but the Court also noted that those officials were not involved in high-risk or safety-sensitive tasks nor were they part of any drug interdiction effort. Id. 321–22. Thus, all that was left was an image that the State wished to project that "candidates, if elected, will be fit to serve their constituents," at least to the extent of being "free from the influence of illegal drugs." Id. at 321.[5] However, the Court refused to credit this interest as a substantial special need, but instead concluded the need was merely "symbolic" and would not justify suspicionless drug testing. Id. at 322.

---

[5] The Court also pointed out that Georgia failed to show "why ordinary law enforcement methods would not suffice to apprehend such addicted individuals, should they appear in the limelight of a public stage." Id. at 320.

For reasons similar to those expressed by the Court in <u>Chandler</u>, we cannot say that the district court abused its discretion in determining that the State failed to establish a substantial special need for mandatory drug testing of TANF applicants.  Here, the State argues that there is a "special need" to test TANF applicants because TANF funds should not be used for drugs as drug use undermines the program's goals of moving applicants into employment and promoting child welfare and family stability.  But this argument, which assumes drug use, begs the question. The question is <u>not</u> whether drug use is detrimental to the goals of the TANF program, which it might be.  Instead, the only pertinent inquiry is whether there is a substantial special need for mandatory, suspicionless drug testing of TANF recipients when there is no immediate or direct threat to public safety, when those being searched are not directly involved in the frontlines of drug interdiction, when there is no public school setting where the government has a responsibility for the care and tutelage of its young students, or when there are no dire consequences or grave risk of imminent physical harm as a result of waiting to obtain a warrant if a TANF recipient, or anyone else for that matter, is suspected of violating the law.  We conclude that, on this record, the answer to that question of whether there is a substantial special need for mandatory suspicionless drug testing is "no."

16

As the district court found, the State failed to offer any factual support or to present any empirical evidence of a "concrete danger" of illegal drug use within Florida's TANF population. See id. at 319. The evidence in this record does not suggest that the population of TANF recipients engages in illegal drug use or that they misappropriate government funds for drugs at the expense of their own and their children's basic subsistence. The State has presented no evidence that simply because an applicant for TANF benefits is having financial problems, he is also drug addicted or prone to fraudulent and neglectful behavior.[6]

---

[6] In concluding that the State failed to present evidence in support of its alleged special needs, the district court also noted that the State failed to address the only competent evidence in the record about drug use among TANF recipients. That evidence derived from a study, known as the Demonstration Project, which had been developed and implemented by DCF in 1998. DCF conducted the study after the State passed legislation requiring the Demonstration Project to test empirically whether individuals who applied for TANF benefits were likely to abuse drugs and whether such abuse affected employment opportunities. The legislation permitted drug testing only of those individuals for whom DCF had reasonable cause to believe were engaged in illegal drug use. Over an eighteen-month period, the researchers on the Demonstration Project used a written test to screen over 8,700 TANF applicants for reasonable cause to believe they were substance abusers. Of those screened, 1447 applicants were identified as potential substance abusers and required to undergo urinalysis. Only 5.1% (353 individuals) of the total screened population tested positive. The researchers noted that this rate of drug use was lower than had been reported in other national studies of welfare recipients.

The Demonstration Project found no discernible difference in the employment rate and level of government assistance provided to recipients who were drug users and those who were non-users. The researchers concluded that: (1) because it is difficult to determine the extent of drug use among welfare beneficiaries, such estimates should not be used for sanctioning purposes and (2) drug testing may be of little benefit given the finding of inconsequential differences between drug users and non-users on employability and reliance on government benefits.

The district court found that the results of the Demonstration Project undercut the State's rationale for its asserted need for drug testing. Specifically, the district court noted that the rate of drug use reported in the Demonstration Project of 5.1% is lower than Florida's general population, currently estimated to be around 8.13%, thereby suggesting that TANF applicants are no more likely than any other recipient of government benefits to misuse funds for drug use or expose their children to drugs. The district court also noted that study's conclusion regarding

While "[a] demonstrated problem of drug abuse, [is] not in all cases necessary to the validity of a testing regime," such evidence could "clarify" and "substantiate" the dangers presented by such drug use and whether those dangers were pertinent to the government's asserted special need for drug testing, Chandler, 520 U.S. at 319.  Thus, unlike Skinner, Vernonia, and Earls, in which the government presented evidence of drug use within the affected populations, here, the State presented no empirical evidence to bolster its special needs argument that suspicionless drug testing of TANF applicants is in any way warranted.  See id. (noting that evidence of drug use in Skinner and Vernonia "bolstered the Government's and school officials' arguments that drug-testing programs were warranted and appropriate").[7]  As the Court noted in Chandler,

_____

employability also contradicts the State's rationale that drug users are less likely to find and to keep employment.

Although we find no error in the district court's finding that the results of the Demonstration Project hinders rather than supports the validity of the State's asserted special needs, we do not mean to suggest that there is any affirmative burden on the part of the affected population to bring forth evidence refuting the legitimacy of the State's purported special needs for drug testing.  To the contrary, the Supreme Court has unequivocally stated that it is the state which must show a substantial special need to justify its drug testing.  See e.g., Chandler, 520 U.S. at 318 ("Georgia has failed to show, in justification of [its drug testing statute], a special need of that kind.").

Moreover, the district court did not abuse its discretion in finding that the other evidence submitted by the State failed to support the finding of a special need for drug testing.  The three affidavits from DCF employees only provided a factual description of the TANF program and how the drug testing would be implemented.  None of the affidavits spoke to the State's need for suspicionless drug testing.  Likewise, the district court did not err in rejecting, as irrelevant or non-persuasive, the reports concerning drug use in the welfare populations.

[7] In pointing out that there is no evidence of a demonstrated problem of drug use within Florida's TANF population to support the State's special needs argument, we in no way are

18

"[n]othing . . . hints that the hazards [the State] broadly describe are real and not simply hypothetical." Id. at 319.

There is nothing so special or immediate about the government's interest in ensuring that TANF recipients are drug free so as to warrant suspension of the Fourth Amendment. The only known and shared characteristic of the individuals who would be subjected to Florida's mandatory drug testing program is that they are financially needy families with children. Yet, there is nothing inherent to the condition of being impoverished that supports the conclusion that there is a "concrete danger" that impoverished individuals are prone to drug use or that should drug use occur, that the lives of TANF recipients are "fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences." Skinner, 489 U.S. at 628; see also Von Raab, 489 U.S. at 670.[8]  Thus, the State's argument that it has a special need to ensure that the

_____

suggesting that evidence of drug use within the TANF population would, in and of itself, suffice to establish a substantial special need for mandatory drug testing. Nor do we read any of the Supreme Court's drug testing cases to say that empirical evidence of drug use is sufficient to establish a special need. Instead, all that the Court has said of actual evidence of drug use is that it is neither necessary nor sufficient to establish the type of substantial special needs that permit a drug testing regime to fall within the closely guarded category of permissible suspicionless searches.

[8] We also note that TANF recipients, much like the elected officials in Chandler who often "appear in the limelight of a public stage," 520 U.S. at 320, are subject to regular oversight and monitoring by Florida's welfare officials as part of verifying their ongoing eligibility for the TANF program. They are certainly far more visible to Florida's welfare officials than non-TANF recipient parents struggling with drug addiction. Accordingly, just as the Court in Chandler concluded that there was no reason why ordinary law enforcement would not suffice to deal with drug addicted elected officials, id., we see no reason why here, Florida welfare officials

19

goals of the TANF program are not jeopardized by the effects of drug use seems to rest on the presumption of unlawful drug use. But the Supreme Court has required that a state must present adequate factual support that there exists a "concrete danger," Chandler, 520 U.S. at 319, not simply conjecture that there is a substantial "special need" that cannot be met by ordinary law enforcement methods warranting the drastic action of abrogating an individual's constitutional right to be free from unreasonable government searches.

Moreover none of the State's asserted concerns will be ameliorated by drug testing. While we recognize that Florida has a significant interest in promoting child welfare, the State has presented no evidence that the general welfare of the children in the TANF program is at greater risk absent its drug testing. Nor has the State shown that Florida's children will be better protected because of mandatory drug testing of TANF applicants. As the district court noted, even if a parent tests positive for drugs and is precluded from receiving TANF funds, the TANF program has no impact on the familial and custodial relationships of its would-be participants. Again, there is no evidence that there is greater drug use and child abuse within the population of economically disadvantaged families who participate in the TANF program. However, even if child neglect or abuse, for

would not be able to address drug addiction through normal law enforcement methods when, and if, it manifests itself in a given TANF household.

20

whatever reasons, impacts the lives of families in the TANF program, Florida has a separate, well-established and comprehensive statutory, administrative and judicial scheme codified in Chapter 39 of the Florida Statutes, which governs Florida's obligation to protect children from child abuse, abandonment and neglect.[9]  See Fla. Stat. §§ 39.001–39.908.

In short, we cannot say that the district court erred in determining that the State failed to meet its burden of showing a substantial special need permitting the suspension of the Fourth Amendment's protections.  See e.g., Ferguson, 532 U.S. at 81 ("In Chandler, however, we did not simply accept the State's invocation of a 'special need.' Instead, we carried out a 'close review' of the scheme at issue before concluding that the need in question was not 'special,' as that term has been defined in our cases.").  The simple fact of seeking public assistance does not deprive a TANF applicant of the same constitutional protection from unreasonable searches that all other citizens enjoy.  Because we agree with the district court that the State failed to meet its burden in establishing a special need for its mandatory, suspicionless drug testing of TANF applicants, that ends our inquiry into the

---

[9] The State argues that Earls and Vernonia support its position that the government has a substantial concern over child welfare that justifies drug testing of TANF recipients.  Although Earls and Vernonia found the existence of a special need that justified mandatory drug testing of school children, it did so in the unique environment of the public school setting, where the State itself has a parens patriae obligation toward the children under its direct supervision and control.  Earls, 536 U.S. at 834; Vernonia, 515 U.S. at 662.  State officials are not in the same position vis a vis either the adult or child participants in the TANF program and thus, the child welfare-related special need identified in Earls and Vernonia is inapplicable here.

21

testing regime's validity for Fourth Amendment purposes, and thus, we need not weigh any competing individual and governmental interests. See T.L.O., 469 U.S. at 351 (Blackmun, J., concurring in judgment) (explaining that the balancing of government interests against the individual privacy interests takes place only if the government establishes a special need for drug testing).

We turn then to the State's alternative argument that even if we find no substantial special need supporting Florida's mandatory drug testing of TANF recipients, the drug testing program is still constitutionally valid because it is based on consent. As noted, under Florida's program, an applicant is required to sign an acknowledgment that he or she consents to drug testing. Accordingly, the State argues that because the drug test is administered only to those persons who have consented to the test and because a consented-to search is deemed reasonable, Florida's mandatory drug testing program does not run afoul of the Fourth Amendment.

We cannot say that the district court abused its discretion in concluding that the "State's exaction of consent" failed to render the otherwise unconstitutional drug testing valid for Fourth Amendment purposes. We disagree with the State that the mandatory "consent," which Florida's drug-testing statute makes a condition to the receipt of benefits, is of any constitutional significance. Although a "search conducted pursuant to a valid consent is constitutionally permissible,"

22

see Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973), a valid consent means one which is "in fact, freely and voluntarily given," see Bumper v. North Carolina, 391 U.S. 543, 548 (1968). The State's assertion that the "consent" that is provided by TANF applicants renders the drug testing reasonable for Fourth Amendment purposes is belied by Supreme Court precedent, which has invalidated searches premised on consent where it has been shown that consent "was granted in submission to authority rather than as an understanding and intentional waiver of a constitutional right." See Johnson v. United States, 333 U.S. 10, 13 (1948) (holding as invalid a search of defendant's home which "was demanded under color of office" even though the government officials did not possess a search warrant); see also Bumper, 391 U.S. at 548–49 ("[The government's] burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority."); Amos v. United States, 255 U.S. 313, 317 (1921) ("The contention that the constitutional rights of defendant were waived when his wife admitted to his home the government officers, who came, without warrant, demanding admission to make search of it under government authority, cannot be entertained. . . . [I]t is perfectly clear that under the implied coercion here presented, no such waiver was intended or effected.").

By informing TANF applicants that the drug test is one of many conditions to receiving this government-issued benefit and that the applicant's refusal to give

23

consent means that he is ineligible to receive TANF assistance, the State conveys a message that it has the unfettered lawful authority to require such drug testing—period. But it does not and can only do so upon a showing of individualized suspicion or a special need beyond the need for normal law enforcement, both of which are absent in Florida's drug testing program. Accordingly, a TANF applicant's "consent" to the testing by signing a form waiving his constitutional rights amounts to nothing more than "submission to authority rather than . . . an understanding and intentional waiver of a constitutional right." Johnson, 333 U.S. at 13.

We note that even though each of the drug testing regimes in Skinner, Von Raab, Vernonia, Chandler, and Earls required the affected employees, students or political office candidates to "consent" to the drug testing in order to maintain employment, participate in school activities or gain access to the ballot, the Supreme Court has never held that such drug testing regimes were constitutionally reasonable because of consent. Instead, every time that the Supreme Court has been asked to address the validity of a government mandated drug testing policy, it has applied the same special needs analysis and reasonableness balancing, whether upholding or rejecting those policies. Simply put, we have no reason to conclude that the constitutional validity of a mandated drug testing regime is satisfied by the

24

fact that a state requires the affected population to "consent" to the testing in order to gain access or retain a desired benefit.

The State's reliance on Wyman v. James, 400 U.S. 309 (1971) to support its contention that the mandatory consent here renders the drug testing reasonable for Fourth Amendment purposes is misplaced. Fundamentally, Wyman is inapplicable to whether Florida's drug testing of TANF applicants is a constitutionally reasonable search. In Wyman, the Court addressed whether the State of New York could make home visits by state welfare workers a mandatory condition to the initial or ongoing receipt of Aid to Families with Dependent Children ("AFDC") benefits, or whether the recipient could refuse entry to her home without risking eligibility for benefits. 400 U.S. at 310. The recipient argued, among other grounds, that the state welfare worker's home visit was a search subject to the requirements of the Fourth Amendment. Id. at 313. Although the Court acknowledged the principle that "a search of private property without proper consent is unreasonable unless it has been authorized by a valid warrant," it concluded that "[t]his natural and quite proper protective attitude, however, is not a factor in this case." Id. at 317 (emphasis added). Instead, the Court went on to hold that the state welfare worker's home visit was not a search, and thus the Fourth Amendment or any of its requirements or protections did not matter. "[W]e

25

are not concerned here with any search by the New York social service agency in the Fourth Amendment meaning of that term." Id.

In this case, however, the fact that government-mandated drug testing is a search has been well-settled and beyond any debate since the Court's decision in Skinner. See Skinner, 489 U.S. at 617 ("Because it is clear that the collection and testing of urine intrudes upon expectations of privacy that society has long recognized as reasonable, . . . these intrusions must be deemed searches under the Fourth Amendment."). This fundamental difference between the state welfare worker's home visit (which is not a search) and the drug testing at issue here (which is a search) renders Wyman inapplicable to the constitutionally significant question of whether the mandated consent that is part of Florida's drug testing regime makes the search reasonable. Thus, we cannot agree with the State's argument that Wyman held that "consent" to an "administrative-search requirement" renders the "search constitutional," as this contention simply ignores that the Court in Wyman concluded that there was no search. Therefore, because there was no search, the Court had no reason to decide whether the AFDC recipient's "consent" would have rendered the home visit constitutionally reasonable for purposes of the Fourth Amendment.

Thus, when the Court in Wyman noted that the home visit was not forced or compelled, that the denial of permission to enter the home was not a criminal act,

26

and that the withholding of consent resulted in no home visit and the cessation of welfare benefits, it made these statements to explain why it reached its holding that the welfare home visit is not a Fourth Amendment search. Wyman, 400 U.S. at 317–18. It simply never reached the question of whether, and under what conditions, a mandatory "consent" could render an actual Fourth Amendment search reasonable.[10]

Moreover, the mandated "consent" the State relies on here, which is not freely and voluntarily given, runs afoul of the Supreme Court's long-standing admonition that the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests." Perry v. Sindermann, 408 U.S.

---

[10] Although the Court held in Wyman that a welfare home visit is not a Fourth Amendment search, the Court went on to discuss why such a visit would nonetheless be reasonable, if the Court assumed that it was similar to a traditional search. See Wyman, 400 U.S. at 318–24. The State does not rely on this part of Wyman to support its position regarding "consent" and we find nothing in the Court's reasonableness analysis that would support the conclusion that Florida's requirement that TANF recipients "consent" to mandatory drug testing renders the subsequent search reasonable for the Fourth Amendment. Wyman is further distinguishable as it was decided outside the context of drug testing and the Supreme Court has well-established precedent that governs the reasonableness of drug testing in the event a court is called upon to balance the competing government and individual privacy interests. Moreover, because we have already concluded that the State failed to establish a "substantial special need" for mandatory suspicionless drug testing, we need not balance any government interest against individual privacy interests, and thus Wyman's reasonableness analysis is irrelevant here.

The Court's statement that the welfare recipient's failure to grant consent to a home visit was entirely her choice and involved "nothing of constitutional magnitude," does not support the State's position here, that TANF recipients, like Lebron, who refuse to submit to drug testing have had no constitutional rights violated. Wyman, 400 U.S. at 324. That the welfare recipient's choice to deny a home visit involved "nothing of constitutional magnitude" is because the Court held that the welfare home visit is not a search for purposes of the Fourth Amendment and thus the decision to permit or to deny such a home visit simply does not infringe upon any constitutional rights. Here, however, because a government mandated drug test is a search, the decision regarding submission to that search directly implicates an individual's Fourth Amendment rights.

27

593, 597 (1972).  The Court reiterated in a subsequent case that "[u]nder the well-settled doctrine of 'unconstitutional conditions,' the government may not require a person to give up a constitutional right . . . in exchange for a discretionary benefit conferred by the government where the benefit sought has little or no relationship to [the right]."  Dolan v. City of Tigard, 512 U.S. 374, 385 (1994).

The Supreme Court recognized this principle, as long as a century ago in Bailey v. Alabama 219 U.S. 219, 245 (1911), where it explained that if a State's procedures, in their natural operation, transgress a substantive constitutional right, those procedures are unconstitutional.  Although the Court in Bailey recognized that states generally possess the power to prescribe procedures affecting their own laws, the Court went on to hold that this state power is limited when federal constitutional rights are at stake.  See 219 U.S. at 239 ("The power to create [state procedural rules] is not a means of escape from constitutional restrictions.").  Succinctly put, "[w]hat the state may not do directly it may not do indirectly."  Id. at 244.  Later in Speiser v. Randall, 357 U.S. 513, 526, 528–29 (1958), the Court applied the principles of Bailey in holding that the state of California could not place the burden on taxpayers to attest that they did not advocate the overthrow of the government in order to receive the government benefit of a tax exemption without violating the taxpayers' First Amendment and Fourteenth Amendment due process rights.  See also Sherbert v. Verner, 374 U.S. 398, 404 (1963) (holding that

28

a state could not force an individual to choose between "following the precepts of her religion and forfeiting [unemployment compensation] benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand" without unconstitutionally burdening the First Amendment right to free exercise of religion).

Here, because the state of Florida cannot drug test TANF applicants absent individualized suspicion or a showing of a governmental substantial special need that outweighs the applicant's privacy rights, it cannot do so indirectly by conditioning the receipt of this government benefit on the applicant's forced waiver of his Fourth Amendment right. Indeed, in Speiser, the Court did not say that the taxpayer could avoid an unconstitutional infringement on his First Amendment rights simply by choosing not to seek the tax exemption. Nor did the Court say in Speiser that those taxpayers who acquiesced and signed the attestation in order to receive the tax exemption had properly waived their First Amendment right against compelled speech thereby rendering the government's procedures constitutionally acceptable. Instead in Bailey, Speiser and Perry, the Court was clear that where an individual's federal constitutional rights are at stake, the state cannot accomplish indirectly that which it has been constitutionally prohibited from doing directly. Those same principles are equally applicable here. The State cannot mandate "consent" to drug testing, which essentially requires a TANF

29

applicant to choose between exercising his Fourth Amendment right against unreasonable searches at the expense of life-sustaining financial assistance for his family or, on the other hand, abandoning his right against unreasonable government searches in order to access desperately needed financial assistance, without unconstitutionally burdening a TANF applicant's Fourth Amendment right to be free from unreasonable searches. Accordingly, we cannot say that the district court abused its discretion in rejecting the State's "consent" argument as a violation of the unconstitutional conditions doctrine. See e.g., Thomas v. Review Bd. of Ind. Emp't Sec. Div., 450 U.S. 707, 716 (1981) (explaining in an unemployment benefits case that "a person may not be compelled to choose between the exercise of a First Amendment right and participation in an otherwise available public program"); Bourgeois v. Peters, 387 F.3d 1303, 1324, 1325 (11th Cir. 2004) ("Our circuit has roundly condemned the use of unconstitutional conditions. . . . [T]he very purpose of the unconstitutional conditions doctrine is to prevent the government from subtly pressuring citizens, whether purposely or inadvertently, into surrendering their rights.").

### III.    Conclusion

Because we conclude that the State has failed to establish a substantial special need to support its mandatory suspicionless drug testing of TANF recipients, the district court did not abuse its discretion in granting the preliminary

30

injunction enjoining the State from enforcing § 414.0652, Fla. Stat.

**AFFIRMED.**

JORDAN, Circuit Judge, concurring.

I concur in Judge Barkett's opinion for the court, and write to emphasize certain points about this case.

1. We are not making any definitive legal pronouncements about the ultimate constitutionality of Fla. Stat. § 414.0652. We are reviewing the grant of a preliminary injunction on an undeveloped record, and therefore are considering only the district court's determination that Mr. Lebron is likely to succeed on the merits of his Fourth Amendment claim. *See, e.g., Doran v. Salem Inn, Inc.,* 422 U.S. 922, 932 (1975) ("In these circumstances, and in the light of existing case law, we cannot conclude that the district court erred by granting preliminary injunctive relief. This is the extent of our appellate inquiry, and we 'intimate no view as to the ultimate merit of [respondent's] contentions.'") (citation omitted); *Di Giorgio v. Causey,* 488 F.2d 527, 528-29 (5th Cir. 1973) ("[O]n appeal from a preliminary injunction this Court does not concern itself with the merits of the controversy. . . . No attention is paid to the merits of the controversy beyond that necessary to determine the presence or absence of an abuse of discretion.").

2. Because of the limited nature of our review, our look at the "substantial likelihood of success" prong is for abuse of discretion, and is not *de novo*. There is language in some of our cases indicating that we take a plenary look at legal issues in reviewing the grant or denial of preliminary injunctive relief, but the better view

(and the one consistent with Supreme Court precedent) is that a deferential standard of review applies when we are dealing with the district court's assessment of probability of success on a limited record. *See, e.g., Ashcroft v. A.C.L.U.,* 542 U.S. 656, 666 (2004) (concluding that district court's determination as to likelihood of success "was not an abuse of discretion"); *LSSI Data Corp. v. Comcast Phone LLC,* 696 F.3d 1114, 1120 (11th Cir. 2012) ("The first question before us is whether the district court abused its discretion in concluding that LSSI has shown a 'substantial likelihood of success' on the merits of its claim."); *Bellsouth Telecommunications, Inc. v. MCIMetro Access Transmission Services, LLC*, 425 F.3d 964, 970 (11th Cir. 2005) ("The district court did not abuse its discretion in determining that Bellsouth had established a substantial likelihood of success."); *Ingram v. Ault,* 50 F.3d 898, 900 (11th Cir. 1995) (reviewing district court's "substantial likelihood of success" determination for abuse of discretion); *Café 207, Inc. v. St. Johns County,* 989 F.2d 1136, 1137 (11th Cir. 1993) ("Whether the district court's determination of this point [substantial likelihood of success] is right or wrong, the record here indicates no abuse of discretion.").

3. Insofar as burdens are concerned, this is not the typical preliminary injunction case. It is undisputed that a drug test is a search under the Fourth Amendment, and that the government generally has the burden of justifying a warrantless search. *See, e.g., United States v. Bachner,* 706 F.2d 1121, 1126 (11th

33

Cir. 1983) ("If the movant establishes an expectation of privacy and that the search and seizure took place without a search warrant, then the burden shifts to the state to establish that an exception to the search warrant requirement was applicable in the subject case and that the search and seizure was, in fact, a reasonable one.") (citing *Coolidge v. New Hampshire,* 403 U.S. 443, 455 (1961)).   Thus, as the Supreme Court has explained, the government has the burden of establishing a "special need" for a warrantless and suspicionless drug testing requirement.  *See Chandler v. Miller,* 520 U.S. 305, 318 (1997).  *See also United States v. Jeffers,* 342 U.S. 48, 51 (1951) ("the burden is on those seeking the exemption [to the warrant requirement] to show the need for it").  This means that the state, and not Mr. Lebron, had the burden below with respect to the constitutionality of § 414.0652, for "the burdens at the preliminary injunction stage track the burdens at trial."  *Gonzalez v. O Centro Beneficiente Uniao do Vegetal,*  546 U.S. 418, 429 (2006).  *See also Ashcroft,* 542 U.S. at 666 (preliminary injunction case: "As the government bears the burden of proof on the ultimate question of COPA's constitutionality, [the plaintiffs challenging COPA] must be deemed likely to prevail unless the government has shown that [the plaintiffs'] proposed less restrictive alternatives are less effective than COPA.").

4. I am not persuaded by the only other appellate decision addressing the constitutionality of a warrantless and suspicionless drug testing program for

34

recipients of government aid—the Sixth Circuit's now-vacated panel decision in *Marchwinski v. Howard,* 309 F.3d 330, 333-37 (6th Cir. 2002) (reversing preliminary injunction entered by district court and indicating that Michigan pilot program requiring warrantless and suspicionless drug testing of welfare applicants was likely constitutional), *vacated on grant of rehearing en banc,* 319 F.3d 258 (6th Cir. 2003), *decision of district court affirmed by equally divided vote,* 60 F. App'x 601 (6th Cir. 2003) (en banc).    First, the Sixth Circuit panel—contrary to the teaching of cases like *Ashcroft* and *Gonzalez*—apparently placed the burden on the plaintiffs to demonstrate the unconstitutionality of the state's warrantless and suspicionless drug testing program.    *See* 309 F.3d at 336-37.    Second, the Sixth Circuit panel relied too heavily on "special needs" cases arising in the school setting.    *See id.* at 334-35.    Those cases, it seems to me, are distinguishable because they involved two critical aspects not present here – the lessened expectation of privacy held by minor students, and the state's custodial and tutelary role in education.    *See Vernonia School Dist. 47J v. Acton,* 515 U.S. 646, 654 (1995) ("Central, in our view, to the present case is the fact that the subjects of the Policy are (1) children, who (2) have been committed to the temporary custody of the State as schoolmaster."); *Bd. of Education v. Earls,* 536 U.S. 822, 828 (2002) ("As in *Vernonia*, the context of the public school environment serves as the backdrop for the analysis of the privacy interest at stake and the reasonableness of the drug

testing policy in general."). Third, the Sixth Circuit panel did not give enough weight to the Supreme Court's decision in *Chandler.  See* 309 F.3d at 334-35. As a result, the district court here did not abuse its discretion in refusing to follow the vacated panel decision in *Marchwinski*.

5. In my view the doctrine of unconstitutional conditions is somewhat incoherent, and some of the cases decided under it are difficult to reconcile. *See generally* Kathleen M. Sullivan, *Unconstitutional Conditions*, 102 HARV. L. REV. 1413, 1416 (1989) ("As applied . . . the doctrine of unconstitutional conditions is riven with inconsistencies"). *Compare, e.g., Lyng v. Automobile Workers*, 485 U.S. 360, 368 (1988) (denying food stamps to workers on strike does not infringe on First Amendment rights) *with, e.g., Sherbert v. Varner*, 374 U.S. 398, 404-05 (1963) (denying unemployment benefits to a Seventh Day Adventist who rejected suitable employment opportunities because she would not work on Saturdays violates the First Amendment). Nevertheless, the district court did not abuse its discretion in following, at least preliminarily, those decisions which teach that the government cannot condition the receipt of, or entitlement to, a benefit on the surrender of a constitutional right. *See, e.g., Perry v. Sinderman*, 408 U.S. 593, 597 (1972) ("For at least a quarter-century, this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are

36

some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests . . . "); *Bourgeois v. Peters,* 387 F.3d 1303, 1324 (11th Cir. 2004) ("The doctrine of unconstitutional conditions prohibits terminating benefits, though not classified as entitlements, if the termination is based on motivations that other constitutional provisions proscribe.") (citation omitted). Although the state argues that any tension in the law has been clarified by *Rust v. Sullivan*, 500 U.S. 173 (1991), that argument is unconvincing because *Rust* explicitly distinguished the "unconstitutional conditions" cases and did not purport to overrule *Perry* and its progeny. *See id.* at 196 ("Petitioners' reliance on [*Perry*] is unavailing, however, because here the Government is not denying a benefit to anyone, but is instead simply insisting that public funds be spent for the purposes for which they were authorized."). This case, unlike *Rust*, deals directly with a denial of government benefits.

6. Finally, I am skeptical about the state's insistence at oral argument that the Fourth Amendment permits the warrantless and suspicionless drug testing of all TANF applicants even if the evidence shows, conclusively and beyond any doubt, that there is 0% drug use in the TANF population.   The state's rationale—that such drug testing is permissible because the TANF program seeks to "move people from welfare to work"—proves too much.   Every expenditure of state dollars,

taxpayers hope, is for the purpose of achieving a desirable social goal. But that does not mean that a state is entitled to require warrantless and suspicionless drug testing of all recipients of state funds (e.g., college students receiving Bright Futures scholarships, *see* Fla. Stat. § 1009.53) to ensure that those funds are not being misused and that policy goals (e.g., the graduation of such students) are being achieved. Constitutionally speaking, the state's position is simply a bridge too far.