**Joan E. FRIEDENBERG, on behalf of herself and a class of similarly situated individuals, Plaintiff,**

**v.**

**SCHOOL BOARD OF PALM BEACH COUNTY, Defendant.**

**CASE NO: 9:17–cv–80221–ROSENBERG/HOPKINS**

United States District Court, S.D. Florida.

Signed 06/14/2017

## ORDER DENYING PLAINTIFF's MOTION FOR PRELIMINARY INJUNCTION

ROBIN L. ROSENBERG, UNITED STATES DISTRICT JUDGE SOUTHERN DISTRICT OF FLORIDA

Plaintiff Joan Friedenberg applied for several positions with Defendant School Board of Palm Beach County. She was offered a substitute teacher position, but the offer was conditional. Before attending New Employee Orientation Plaintiff was required to take, and pass, a drug test. Drug testing is imposed on all applicants for any position with Defendant pursuant to Policy 3.96(8)(a). Plaintiff refused testing and brought suit, challenging the application of Policy 3.96(8)(a) to applicants for non-safety sensitive positions on Fourth Amendment grounds.[1]

This cause is before the Court on Plaintiff's Motion for Temporary Restraining Order or, in the Alternative, for Preliminary Injunction. DE 5. Plaintiff seeks to enjoin the application of Policy 3.96(8)(a) to applicants for non-safety sensitive positions with Defendant. Plaintiff's Motion is fully briefed, DE 22, 23, and the Court has heard argument thereon, DE 51. The Court has only considered the application of Policy 3.96(8)(a) to applicants for substitute teacher positions because of standing concerns outlined in Section II(b). With that caveat in mind, Plaintiff's Motion is **DENIED** for the reasons that follow.

## I. FINDINGS OF FACT

### a. The Application Process.[2]

Defendant Palm Beach County School District is the eleventh largest school dis-

FOR THE PLAINTIFF: James Green, James K. Green, P.A., Adam Wolf, Peiffer, Rosca, Wolf, Abdullah, Carr & Kane

FOR THE DEFENDANTS: Sean Fahey, The School District of Palm Beach County, Shawntoyia Bernard, School District of Palm Beach County

1. "Safety sensitive" is a term of art drawn from Supreme Court case law. The specific positions Plaintiff refers to as "non-safety sensitive positions" are clarified in Section I(a).

2. The Court notes the parties' agreement, reflected on the record during the hearing, that the record for purposes of the Court's ruling Plaintiff's Motion would include everything filed to the docket as well as all exhibits introduced at the hearing. Hearing Trans. 64–65.

trict in the country. DE 55–4 at 14. Applicants for jobs with Defendant must, first, complete the District Application. DE 22–2 at ¶ 6(b). Applicants who meet the "minimum qualifications" may be invited for an in-person interview. *Id.* at ¶ 6(c). Substitute teachers "are not interviewed," but otherwise "follow the same screening process as all other employees." *Id.* After the interview process (if applicable) is complete, each applicant's references are reviewed and his or her current or most recent supervisor is contacted by phone. *Id.* at ¶ 6(d). Upon a successful reference check, a conditional offer letter is sent. *Id.* at ¶ 6(e). Each applicant who receives a conditional offer "is required to complete a criminal background check (fingerprinting) and a drug screening." *Id.* at ¶ 6(f). Only after completing these two requirements can the applicant attend New Employee Orientation, which is a full day of training. *Id.* at ¶ 6(g). The drug testing requirement is not imposed until *after* receipt of a conditional offer. DE 38–1 at 37:10–20. Some employees, including school police officers and environmental technicians, are required to complete an overall physical as part of the pre-employment screening process. *See* DE 55–4 at 2. An overall physical is not required of substitute teachers. *Id.*

Plaintiff Joan Friedenberg is a retired educator. DE 55–1 at ¶ 2. She applied online for three different positions with Defendant: substitute teacher,[3] tutor,[4] and early childhood aid.[5] *Id.* at ¶¶ 4–5. Every application Plaintiff completed required her to "check a box" indicating that she would be drug tested. *Id.* at ¶ 6. Plaintiff received a conditional offer to work for

Defendant as a substitute teacher on February 21, 2017. *Id.* at ¶ 11. This was the only conditional offer Plaintiff received. Hearing Trans. 79:15–19. The offer was conditioned on Plaintiff's being fingerprinted and submitting to a drug test before her New Employee Orientation, which was scheduled for Monday, February 27, 2017 at 9:00am. DE 55–1 at ¶ 11. Plaintiff underwent fingerprinting, but refused to submit to a drug test. *Id.*

### b. The Drug Testing Requirement Imposed Under Policy 3.96(8)(a).

Policy 3.96 is entitled "Drug and Alcohol–Free Workplace."[6] Policy 3.96 has many provisions, but *only* Section 8(a), which requires suspicionless drug testing of all applicants for any position with Defendant, is being challenged. Section 8(a) provides:

8. Kinds of Testing—Random testing of employees shall not be conducted, except for those employees subject to Policy 3.961. To maintain a drug-free work environment, the District will test for the presence of drugs, including alcohol, in the following circumstances:

a. Pre–Employment Screening—Pre-employment screening will be required of all applicants before employment with the District. Any applicant who tests positive in the pre-employment screening for a drug as defined in this Policy will not be hired and is not eligible to re-apply for employment with the District for one year following the

---

**3.** On January 9, 2017, Plaintiff submitted an online application to be a substitute teacher.

**4.** On December 25, 2016, Plaintiff submitted five online applications to be a tutor.

**5.** On January 8, 2017, Plaintiff submitted an online application to be a childhood aide.

**6.** Defendant has a separate policy, Policy 3.961, requiring suspicionless drug testing of employees Defendant has classified as "safety sensitive." This policy is not being challenged.

confirmed positive test. Similarly, a person applying to be a volunteer may be subject to pre-service screening in some cases, based upon whether the volunteer applicant has a known history of substance abuse, alcohol, or other drug-related problems.

DE 55–2 at 4.

There is an additional caveat. Policy 3.96(8)(a) is *only* being challenged as applied to applicants for non-safety sensitive positions. *See* DE 5 at 5. In response to a request by the Court, Plaintiff clarified that she was using the term non-safety sensitive to refer to all positions with Defendant *except*: (i) Jobs categorized as "safety sensitive" by Defendant pursuant to Policy 3.961; Driver Bus Substitute, Pool Life Guard, Temp Driver Trainee Bus, Driver School Bus I, and Driver School Bus II; and Temp Midnight Shift Supervisor, Officer School Police, Captain School Police, Director School Police, and Major School Police. *See* DE 34 at 1–2.

Drug testing is conducted in conformity with the standards set forth in Florida Administrative Code 59A–24.005. *See* DE 38–1 at 38:22–24; DE 22–4 at ¶ 15. In relevant part, the Code imposes the following procedures: Upon arrival at the collection site, the donor's photo identification is requested. Fla. Admin. Code R. 59A–24.005(3)(c)(2). If the donor does not have proper photo identification, a call is placed to the employer who can positively identify the donor. *Id.* The donor must also provide either a chain of custody form or a letter from the employer authorizing the drug test. *Id.* at 59A–24.005(3)(c)(3). A chain of custody form must be completed for each donor. *Id.* at 59A–24.005(2)(a). The donor is asked to list any medication he or she is currently taking on the chain of custody form. DE 38–1 at 41:11–16. If there is a positive result, this list is used to determine whether it was caused by the use of lawful medications. The chain of custody form "shall contain no information which can be traceable to the donor except the unique identifier, the employee identification number, if used, and the laboratory's specimen number." Fla. Admin. Code R. 59A–24.005(2)(f). Ms. Linda King, who serves as Risk and Safety Manager, testified that only "the testing collection area, the [medical review officer], and the [donor]" see the form. DE 38–1 at 42:1–5.

The donor is instructed to wash and dry his or her hands and, after doing so, he or she must "remain in the presence of the collection site person." Fla. Admin. Code R. 59A–24.005(3)(c)(6). "The individual may provide his or her urine specimen in a stall or otherwise partitioned enclosure that allows for individual privacy. The collection site person shall remain in the restroom or area, but outside the stall or partitioned enclosure." *Id.* at 59A–24.005(3)(2). The testing procedures "shall allow individual privacy unless there is a reason to believe that a particular individual intends to alter or has altered or substituted the specimen to be provided." *Id.* at 59A–24.005(3)(b). If a collection site person "has reason to believe that a particular individual may alter or has altered or substituted a urine specimen, a higher level supervisor ... shall review the decision and concur in advance with the collection of a second specimen under the direct observation of an observer of the same gender as the donor." *Id.* at 59A–24.005(3)(c)(13).

The Defendant's pre-employment physical and drug testing requirements are administered by the Department of Risk & Benefits Management ("The Department"), which is overseen by Ms. King. DE 22–4 at ¶¶ 3–4. Five individuals within the Department have been designated to receive applicants' test results. *Id.* at ¶ 16. Positive results are reported to the Department by e-mail. *Id.* at ¶ 17. The e-mail

informs the Department that there was a positive result and either states the substance(s) for which the applicant tested positive, states that the applicant refused testing or left the test site before completing the test, or states that the Medical Review Officer cancelled the test. *Id.* at ¶ 18. No information besides the presence of the substances tested for is provided to the Department. *Id.* at ¶ 20. The particular department or school site where the applicant would have worked is informed that the applicant failed to pass a pre-employment medical examination, but not that there was a positive result. *Id.* at ¶ 19. All results are maintained in a "confidential electronic medical folder." *Id.* at ¶ 23. If printed, the results are shredded. *Id.* at ¶ 24.

Of 4,956 applicants for positions with Defendant who underwent drug testing in one calendar year pursuant to Policy 3.96(8)(a), forty were disqualified by a positive drug test. DE 55–6 at 1. Of those forty, seven were never tested—instead, they were deemed positive for refusing to take the test or for leaving the testing site. *Id.* at 2–3. In sum, thirty-three applicants—0.67% of the total—were disqualified by positive results after actually completing drug testing. *Id.* Of those thirty-three applicants, five had applied for substitute teacher positions. *Id.* Three were disqualified for marijuana and one was disqualified for cocaine. *Id.* The record contains evidence of only one instance in which a teacher came to work impaired. She yelled at, made sarcastic comments to, and "hit [a] student gently across the arm/chest..." DE 55–8 at ¶ 1. There is no other record evidence of harm befalling a student because of a teacher's impairment. Hearing Trans. 51:13–20.

### c. The Role and Supervision of Substitute Teachers.

The Substitute Teacher Handbook advises that a substitute teacher is "as legally responsible for students, equipment, and materials as is the regular teacher for whom [he or she] is substituting." DE 22–2, Ex. C at ¶ 7. Substitute teachers "have the responsibility at all times to monitor and supervise children and ensure their safety while they are on school campuses." DE 22–3 at ¶ 9. A substitute teacher's specific responsibilities in this regard include: detecting and reporting or addressing potential dangers on campuses, such as hazardous conditions; ensuring students do not hurt themselves in the classroom or elsewhere on campus; preventing or stopping fights between students; detecting drug use or possession, or possession of weapons by students; and detecting and reporting students' health issues, such as detecting signs of illness or other health episodes and responding promptly and appropriately. *Id.* at ¶ 8. School employees, including substitute teachers, are also "on the frontlines of securing the campus and are often the first responders to any given incident." DE 22–1 at ¶ 16. Indeed, school police rely on these individuals to timely report issues involving crime or safety. *Id.*

The Substitute Teacher Handbook specifically instructs substitutes to advise the substitute contact of any limitation or restriction before beginning an assignment so they "will be prepared to provide safety and accountability for students in any situation and at all times." DE 22–2 at ¶ 16. To effectuate these responsibilities, it is important that substitute teachers be of sound mind at all times, DE 22–3 at ¶ 16, because substitute teachers must be "constantly aware of everything going on around them while they are working," DE 22–4 at ¶ 14.

On a typical day, a substitute teacher will spend between five-and-a-half and six-and-a-half hours working with students in the classroom. DE 22–3 at ¶ 11–14. Substitute teachers could be alone with students

for five-and-a-half hours a day or more. DE 30–1 at 43:8–18. Monitoring the behavior of substitute teachers is the principal's responsibility. *Id.* at 20:18–23. Teachers, including substitute teachers, are monitored through observation during classroom visits as well as when they are transitioning students to other locations, like lunch or recess. DE 30–1 at 19:21–25; 20:1–5. Principals sometime also receive feedback from other teachers. *Id.* at 19:10–15.

But opportunities to observe substitute teachers are relatively limited.[7] Principals have an opportunity to observe substitute teachers when they "check in" at the beginning of the day, DE 30–1 at 19:22–25, to register at the main office and ask a school contact about instructional materials, DE 22–2, Ex. C at ¶¶ 5, 8. The substitute teacher is then given a set of lesson plans and another teacher, an assistant principal, a coach, or other support personnel "might" provide additional support by orienting the substitute to the materials and resources for "maybe 10, 15 minutes." *Id.* at 46: 12–17. The Chief Academic Officer explained that principals may have between fifteen and thirty minutes to observe a substitute teacher in his or her classroom on a given day; however, such observation does not always occur. DE 30–1 at 48:7–19. Principals are often pulled away by a variety of other tasks including supervising the entire campus, visiting other classrooms, and examining budgets. DE 30–1 at 49:1–10. Detecting impairment in substitute teachers is particularly difficult because principals and administrators typically spend less time with substitute teachers than with other school employees and do not have strong relationships with substitute teachers. DE 22–3 at ¶ 18.

---

**7.** Mr. Oswald, the Defendant's Chief Academic Officer, testified that teachers are subject to "constant interaction and just monitoring throughout the day." DE 30–1 at 19:16–

## II. CONCLUSIONS OF LAW

### a. Legal Standard Applicable to Plaintiff's Motion for Preliminary Injunction.

The party seeking a preliminary injunction must establish: a substantial likelihood of success on the merits, that irreparable injury will be suffered unless the injunction issues, that the threatened injury to the moving party outweighs whatever damage the injunction might cause the non-moving party, and that the injunction would not be adverse to the public interest. *Lebron v. Sec'y, Florida Dep't of Children & Families*, 710 F.3d 1202, 1206 (11th Cir. 2013) (quoting *Keeton v. Anderson–Wiley*, 664 F.3d 865, 868 (11th Cir. 2011)). Failure to show any of the four factors is fatal. *Am. Civil Liberties Union of Fla., Inc. v. Miami–Dade Cty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009). The most common failure is not showing a substantial likelihood of success on the merits. *Id.* A preliminary injunction is an "extraordinary and drastic remedy," not to be granted until the movant clearly carries the burden of persuasion as to the four prerequisites. *Ne. Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990).

A government-mandated drug test is a search within the meaning of the Fourth Amendment. *Lebron*, 710 F.3d at 1206 (collecting cases). Here, Defendant is a government entity. Policy 3.96(8)(a) must, therefore, be reasonable. *See* U.S. Const. amend. IV. "Ordinarily, to be reasonable, a search must be based on individualized suspicion of wrongdoing." *Lebron*, 710 F.3d at 1206. The Supreme Court has upheld searches absent a show-

---

19. But when asked, "[i]s there constant interaction between the substitute teacher and the principal on a given day?" he clarified, "Not typically." *Id.* at 49:12–16.

ing of individualized suspicion, but only when "special needs, beyond the normal need of law enforcement, make the warrant and probable-cause requirement impracticable." *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 619, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (internal quotation omitted). And not just any special need will do—"the proffered special need for drug testing must be *substantial." Chandler v. Miller*, 520 U.S. 305, 313, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997) (emphasis added).

Only if the government is able to show a substantial special need will the court proceed to assess the reasonableness of the search, "undertak[ing] a context-specific inquiry, examining closely the competing private and public interests advanced by the parties." *Lebron*, 710 F.3d at 1207 (internal quotation omitted). A search may be conducted absent individualized suspicion "[i]n limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy" if individualized suspicion was required. *Skinner*, 489 U.S. at 624, 109 S.Ct. 1402.

Where burden-shifting is concerned this is not a run-of-the-mill preliminary injunction case. *Id.* at 1218 (Jordan, J., concurring). The Eleventh Circuit has clarified the precise burdens each party bears in a suspicionless drug-testing case. *See Lebron*, 710 F.3d at 1206. Plaintiff must, first, show an unconstitutional search. *Id.* at 1207. In the drug testing context, Plaintiff may meet this initial burden by demonstrating that there was a search conducted without individualized suspicion. *Id.* at 1206. That showing creates a presumption that the search was unconstitutional, shifting the burden to the defendant to produce a substantial special need. *Id.* If the defendant fails to show a special need, the plain

tiff will prevail. *Id.* If the defendant does demonstrate a special need sufficiently important to justify a suspicionless search, the court must then conduct the special needs balancing test, keeping in mind that the ultimate burden of persuasion rests with the plaintiff. *Id.*

Plaintiff has shouldered its initial burden. Neither party challenges the sufficiency of Plaintiff's showing that Defendant is conducting searches without individualized suspicion. Drug testing is a search within the meaning of the Fourth Amendment. And the drug testing requirement in Policy 3.96(8)(a) is imposed on all applicants for any position—it is suspicionless. The remaining questions are whether Defendant has demonstrated a special need and which party the special needs balancing test favors. However, because of the standing consideration discussion in Section I(b), the Court has only considered the application of Policy 3.96(8)(a) to applicants for the substitute teacher position—the position for which Plaintiff received a conditional offer.

**b. Whether Plaintiff has Standing to Challenge the Application of Policy 3.96(8)(a) to all Applicants for any "Non Safety–Sensitive" Position with Defendant.**

"Federal courts are courts of limited jurisdiction," *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994), "empowered to hear only those cases within the judicial power of the United States as defined by Article III of the Constitution," *Taylor v. Appleton*, 30 F.3d 1365, 1367 (11th Cir. 1994). Article III confines federal jurisdiction to "cases and controversies." U.S. Const. Art. III. The doctrine of standing aids federal courts in determining whether a particular case is "of the justiciable sort referred to in Article III"

by distinguishing "those disputes which are appropriately resolved through the judicial process" from those which are not. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotation and citation omitted). "[S]tanding 'is perhaps the most important of the jurisdictional doctrines.'" *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) (alteration in original) (quoting *Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). Because the doctrine "stems directly from Article III's 'case or controversy' requirement," it goes directly to subject matter jurisdiction. *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1242 (11th Cir. 2003) (citing *Vermont Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000)).

Plaintiff bears the burden of establishing the three elements comprising the "irreducible constitutional minimum of standing." *Id.* First, Plaintiff must establish an injury-in-fact. The injury-in-fact must be "concrete and particularized" as well as "actual or imminent" (as opposed to being "conjectural or hypothetical"). *Id.* (internal citations and quotation omitted). To satisfy this requirement, Plaintiff must "present 'specific, concrete facts' showing that the challenged conduct will result in a 'demonstrable, particularized injury' to the plaintiff." *Miccosukee Tribe of Indians of Florida v. Florida State Athletic Com'n*, 226 F.3d 1226, 1229 (11th Cir. 2000) (quoting *Cone Corp.*, 921 F.2d at 1204). "Because injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party alleges ... a real and immediate ... threat of *future* injury." *Shotz v. Cates*, 256 F.3d 1077, 1081 (11th Cir. 2001) (quoting *Wooden v. Bd. of Regents of Univ. Sys. of Ga.*, 247 F.3d 1262, 1284 (11th Cir. 2001)). Second, Plaintiff must establish a causal connection between the alleged injury-in-fact and the conduct complained of. *Lujan v. Defs. of Wildlife*, 504 U.S. at 560, 112 S.Ct. 2130 (internal quotation and citation omitted). Third, and finally, Plaintiff must show that a favorable decision would likely redress the injury-in-fact. *Id.*

Here, Defendant did not question Plaintiff's standing. But that does not bar the Court from considering the matter *sua sponte*. See *United States v. Hays*, 515 U.S. 737, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995) ("The question of standing is not subject to waiver ... 'the federal courts are under an independent obligation to examine their own jurisdiction, and standing is perhaps the most important of [the jurisdictional] doctrines.'") (internal quotation omitted). The Eleventh Circuit has addressed "how much evidence a plaintiff must present to obtain a preliminary injunction when the defendant raises no standing issue." *Church v. City of Huntsville*, 30 F.3d 1332, 1336 (11th Cir. 1994). The Eleventh Circuit declined "to impose a standing burden beyond the sufficiency of the allegations of the pleadings" on a plaintiff seeking a preliminary injunction "unless the defendant puts the plaintiff on notice that standing is contested." *Id.* The Court concluded that, in such circumstances, "the plaintiffs' standing should be judged on the sufficiency of the allegations of the complaint, with any preliminary hearing evidence favorable to the plaintiffs on standing treated as additional allegations of the complaint." *Id.*

However, the Eleventh Circuit explicitly declined to determine the degree of evidence necessary to support standing when the plaintiff is on notice that standing is contested. *Id.* at n.1. Here, Defendant did not contest standing; however, the Court placed Plaintiff on notice, in advance of the hearing, that it intended to inquire into standing *sua sponte* by requesting additional briefing on the issue. The Court,

therefore, considers the additional briefing requested on the issue of standing, as well as counsel's representations at the preliminary injunction hearing. The Court treats the allegations in the complaint as having been amended to conform to this evidence. *See Cone Corp. v. Fla. Dep't of Transp.*, 921 F.2d 1190, 1206 (11th Cir. 1991) ("If, when it addresses the standing issue, the court has facts beyond the four corners of the complaint before it ... the court may consider such facts. If it considers facts not disclosed in the complaint, the court, in effect, treats the complaint as having been amended to conform to the evidence.").

■ Plaintiff's Motion "challenges the constitutionality of only [Policy 3.96(8)(a) ], as applied to applicants for non-safety-sensitive positions." DE 5 at 5. The Court entered an Order requiring Plaintiff to clarify which positions, exactly, she was referring to when she used the phrase "non-safety-sensitive." DE 33. In response, Plaintiff clarified that she was referring to all jobs with Defendant except for a few job categories enumerated in her notice. *See* DE 34 at 1–2. The Court subsequently required Defendant to file a notice listing all positions that remained to be addressed once those in Plaintiff's notice had been removed from consideration. DE 35. Defendant directed the Court to Exhibit A to Plaintiff's Reply Memorandum in Support of Motion for Preliminary Injunction, representing that all positions that had the note "Regularly works around children" in the column labeled "Review for Policy 3.96," were at issue. DE 37 at 1–2.

However, the only positions to which Plaintiff had applied were substitute teacher, tutor, and early childhood aid. Accordingly, the Court requested briefing on Plaintiff's standing to enjoin the application Policy 3.96(8)(a) to jobs for which Plaintiff had never applied. DE 41. Plaintiff's briefing directed the Court to cases which, Plaintiff argued, stand for the prop-

osition that the Court could conditionally certify the class or otherwise grant a broad preliminary injunction pursuant to its equitable powers. DE 44 at 4–5. The Court entered an Order declining to "exercise any power it may have to preliminarily enjoin the application of the All Applicant Policy to all members of the putative class prior to class certification." DE 45 at 3. Plaintiff elected to proceed with the preliminary injunction hearing as opposed to postponing the same until after a determination on class certification. DE 46. Accordingly, argument at the hearing was limited to the positions for which Plaintiff had applied: substitute teacher, tutor, and early childhood aid. Hearing Trans. 8:3–8.

But this Order addresses only the substitute teacher position. Applicants are only required to undergo drug testing *after* receiving a conditional job offer. Put simply: Only a conditional job offer triggers the alleged harm. This fact was acknowledged by Plaintiff at the hearing. Hearing Trans. 80:20–22 ("My honest answer is that what really triggers the harm here is the receipt of the conditional job offer."). Without the alleged harm there is no injury-in-fact, and without an injury-in-fact the "irreducible constitutional minimum" of standing is unsatisfied. Plaintiff only received a conditional offer for the substitute teacher position. Therefore, the Court concludes that Plaintiff has only borne her burden with regard to the substitute teacher position.

c. **Whether Defendant has Shown a "Special Need" to Impose Suspicionless Drug Testing on Applicants for the Substitute Teacher Position.**

■ Only government-mandated drug testing programs that "fit within the closely guarded category of constitutionally permissible suspicionless searches" are exempt from the Fourth Amendment's warrant and probable cause requirement. *Chandler v. Miller*, 520 U.S. 305, 309, 117

S.Ct. 1295, 137 L.Ed.2d 513 (1997). Nothing less than a substantial special need will do, and, demonstrating such a need is Defendant's burden. The Supreme Court has recognized two concerns sufficiently substantial to qualify as special needs meriting an exemption to the Fourth Amendment's warrant and probable cause requirement: "the specific risk to public safety by employees engaged in inherently dangerous jobs and the protection of children entrusted to the public school system's care and tutelage." *Lebron v. Sec'y, Florida Dep't of Children & Families*, 710 F.3d 1202, 1207 (11th Cir. 2013). Understanding the special needs analysis in the handful of Supreme Court cases addressing the issue is essential to evaluating the question before the Court: Whether the Defendant has demonstrated a substantial special need for imposing suspicionless drug testing on applicants for the substitute teacher position.

The Court begins with the two opinions (handed down on the same day) in which the Supreme Court found a special need because of a specific risk to public safety: *Skinner v. Railway Labor Executives' Association*, 489 U.S. 602, 608–12, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) and *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 660–61, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). *Skinner* concerned regulations imposing blood and urine testing on railroad employees who were involved in train accidents or had violated certain safety rules. 489 U.S. 602, 608–12, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). The Court found a special need to impose suspicionless drug testing given the safety-sensitivity of the covered employees' tasks. A task is safety-sensitive, the Court reasoned, if the employees "discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences." *Id.* at 628, 109 S.Ct. 1402. The regulations at issue covered employees performing undisputedly safety-sensitive tasks, including "persons engaged in handling orders concerning train movements, operating crews, and those engaged in the maintenance and repair of systems." *Id.* at 620, 109 S.Ct. 1402. The record also contained evidence of on-the-job intoxication. A 1979 study of the scope of alcohol abuse on seven major railroads revealed that during the study year: one-in-eight railroad workers drank on duty at least once; 5% of workers reported to work 'very drunk' or got 'very drunk' on duty at least once; and 13% of workers reported to work at least 'a little drunk' one or more times. *Id.* at 607 n.1, 109 S.Ct. 1402. The record also evidenced a link between on-the-job intoxication and train accidents. For example, the Federal Railroad Administration determined, after a review of accident reports, that between 1972 and 1983 "the nation's railroads experienced at least 21 significant train accidents involving alcohol or drug use as a probable cause or contributing factor." *Id.* The result: 25 fatalities, 61 non-fatal injuries, and property damage estimated at $19 million. *Id.* "[R]egulating the conduct of railroad employees to ensure safety," the Supreme Court concluded, "presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements." *Id.* at 620, 109 S.Ct. 1402 (citing *Griffin v. Wisconsin*, 483 U.S. 868, 873–874, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987)).

In *Von Raab*, the Supreme Court upheld a United States Customs Service program conditioning promotion or transfer to positions directly involving drug interdiction or requiring the employee to carry a firearm on a drug test. 489 U.S. at 660–61, 109 S.Ct. 1384 (1989). The Court easily concluded that positions directly involving drug interdiction or requiring an employee to carry a firearm were safety-sensitive. *Id.* at 667, 109 S.Ct. 1384. Unlike in *Skinner*, the record in *Von Raab* did not contain evidence of on-the-job intoxication. *Id.*

at 660, 109 S.Ct. 1384. But the Court nonetheless upheld the testing regime. The opinion emphasized the "almost unique mission" of the Customs Service, as the "first line of defense" against the smuggling of illicit drugs into the United States. *Id.* at 668, 109 S.Ct. 1384. And although there was no evidence of an existing drug problem, the record demonstrated that Customs officers directly involved in drug interdiction contended with bribery by the criminal element and with temptation springing from "their own access to vast sources of valuable contraband seized and controlled by the service." *Id.* at 669–70, 109 S.Ct. 1384. The Court reasoned that "national interest in self-protection could be irreparably damaged" were a drug user directly involved in interdiction efforts because "[a] drug user's indifference to the Service's basic mission or, even worse, his active complicity with the malefactors, can facilitate importation of sizable drug shipments or block apprehension of dangerous criminals." *Id.* at 670, 109 S.Ct. 1384.

Next, the Court turns to the two cases in which the Supreme Court found a special need grounded in the protection of children entrusted to the public school system's care and tutelage: *Vernonia School District v. Acton,* 515 U.S. 646, 655, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) and *Board of Education of Independent School District No. 92 of Pottawatomie County v. Earls Vernonia School District v. Acton,* 536 U.S. 822, 835, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002). *Vernonia* concerned a program imposing random drug testing on high school students participating in athletics. 515 U.S. at 655, 115 S.Ct. 2386 (1995). The record indicated a "sharp increase" in drug use in the school district, *id.* at 648, 115 S.Ct. 2386, that had precipitated an "immediate crisis" marked by

disciplinary problems of "epidemic proportions," *id.* at 663, 115 S.Ct. 2386. Student athletes were "leaders of the drug culture." *Id.* at 649, 115 S.Ct. 2386. Despite this marked evidence of a substance abuse problem, *Vernonia* characterized the local government's "responsibilities, under a public school system, as the guardian and tutor of children entrusted to its care" as the "most significant element" in the case. *Id.* at 665, 115 S.Ct. 2386; *see also id.* ("Central ... is the fact that the subjects of the policy are (1) children, who (2) have been committed to the temporary custody of the State as schoolmaster."). The opinion heavily emphasized the students athletes' diminished expectation of privacy.

In *Board of Education of Independent School District No. 92 of Pottawatomie County v. Earls* the Supreme Court sustained a policy requiring suspicionless drug testing of all students participating in an extracurricular activity—not just athletes. The record included evidence of drug use at Tecumseh, Oklahoma schools. 536 U.S. 822, 834, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002). But, the Court emphasized that "[a] demonstrated problem of drug abuse ... [is] not in all cases necessary to the validity of a testing regime," although it does "shore up an assertion of special need for a suspicionless general search program." *Id.* at 835, 122 S.Ct. 2559 (quoting *Chandler v. Miller,* 520 U.S. 305, 319, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997)). The Court's conclusion that a special need was present leaned largely on the Court's recognition "that 'special needs' inhere in the public school context." *Id.* at 829, 122 S.Ct. 2559. Again, the opinion heavily emphasized the students' diminished expectation of privacy.

The only circuit court of appeal[8] to address the existence of a special need to

---

8. Plaintiff argues that the Fifth Circuit, too, addressed the existence of a special need to drug test teachers when it struck down a

policy requiring teachers injured on the job to undergo drug testing. *United Teachers of New*

impose suspicionless drug testing on applicants for teaching positions—the Sixth Circuit Court of Appeals—answered the question affirmatively. *Knox Cty. Educ. Ass'n v. Knox Cty Bd of Educ.*, 158 F.3d 361 (1998). The Sixth Circuit concluded that teachers "discharge duties fraught with risks of injury to others such that even a momentary lapse of attention can have disastrous consequences." *Id.* at 378 (quoting *Skinner*, 489 U.S. at 628, 109 S.Ct. 1402). The opinion acknowledged that teachers do not "fit neatly into the prototypical 'safety sensitive positions' "—in contrast with nuclear power plant workers, seamen operating oil tankers, and bus drivers, but declined to interpret the term "safety sensitive" so narrowly as to exclude teachers. But the Court emphasized the common sense reality that a momentary lapse of attention by an educator can have disastrous consequences for his or her charges. *Id.* The Court also emphasized the unique *in loco parentis* role occupied by teachers.

But the majority of lower courts to address the question have concluded that teaching is not a safety sensitive position. *Am. Fed'n of Teachers–W. Virginia, AFL–CIO v. Kanawha Cty. Bd. of Educ.*, 592 F.Supp.2d 883, 903 (S.D.W.Va. 2009) ("The question is not whether teachers have *anything* to do with safety, but is rather whether the *magnitude* of that role qualifies as a concrete special need. ... Bumps and bruises of students tussling in the hallways or on the playground are not special needs."); *Jones v. Graham County Bd. of Educ.*, 197 N.C.App. 279, 677 S.E.2d 171, 180 (2009); *In re Patchogue–Medford Congress of Teachers v. Bd. of Educ.*, 119 A.D.2d 35, 505 N.Y.S.2d 888 (1986). At the

risk of generalizing, these cases rely largely on a lack of evidence of a drug problem or of specific instances in which harm befell a student because of a teacher's impairment.

■■■■ The case before the Court does not fit neatly into either category of special needs recognized by the Supreme Court. It is, instead, a little bit of both. Substitute teachers "discharge duties fraught with risks of injury to others such that even a momentary lapse of attention can have disastrous consequences." *Id.* at 378. Take, for example, a momentary lapse of attention during a student's deadly allergic reaction, while a student is choking, or while a student is placing a weapon in his or her locker. Even a momentary lapse of attention during such circumstances could be the difference between life and death.

Plaintiff emphasizes that these threats are merely hypothetical in the absence of record evidence of such harm having befallen a student because of a teacher's impairment. The Court disagrees. The Court is unpersuaded that the harms presented by Defendant lack sufficient concreteness. In *Chandler*, the Supreme Court dismissed as "merely hypothetical," the contention that it was necessary to drug test applicants for high state office: "because the use of illegal drugs draws into question an official's judgment and integrity; jeopardizes the discharge of public functions, including antidrug law enforcement efforts; and undermines public confidence and trust in elected officials." *Chandler*, 520 U.S. at 318, 117 S.Ct. 1295. These purported hazards are far more imprecisely outlined than those at

---

*Orleans v. Orleans Parish Sch. Bd. Through Holmes*, 142 F.3d 853 (1998). However, the Fifth Circuit's opinion is distinguishable. The Fifth Circuit's conclusion depended heavily on the under-inclusiveness of drug testing only teachers injured on the job, which re-

vealed that the challenged rule served a generalized interest in law enforcement—specifically, the "state's generalized interest in not paying compensation claims of employees whose injury was caused by drug use." *Id.* at 856–57.

issue in this case. Here, the record evidences that discerning and responding to such life-threatening situations is among a substitute teachers' duties. DE 22-3 at ¶ 8. The record also evidences that constant awareness is necessary to do so. That impairment would compromise constant awareness is a matter of common sense. Defendant need not wait for harm to befall a student under its charge to render the risks discussed above sufficiently "concrete." [9]

True, the magnitude of the public safety risk presented by an impaired teacher is not comparable to that presented by an impaired railway operator or armed customs official. But magnitude is not everything, particularly where the public safety risk threatens to compromise "the protection of children entrusted to the public school system's care and tutelage." True, this case is quite different from *Vernonia* and *Earls*. The policy at issue is being imposed not on children with diminished privacy interests, but on substitute teachers. But the unique responsibility with which substitute teachers are entrusted—the care of society's most vulnerable members—nonetheless counsels against imposing too high a "magnitude" threshold in this case.

**d. Whether the Balance of the Competing Public and Private Interests Advanced by the Parties Favors Defendant.**

▮▮▮▮ Because the challenged drug testing regime advances a substantial special need, the Court must "undertake a context-specific inquiry, examining closely the competing private and public interests

advanced by the parties." *Lebron v. Sec'y, Fla. Dept. of Children and Families*, 710 F.3d 1202, 1207 (2013) (internal quotation omitted). The Court begins with Plaintiff's privacy interest, which is plainly implicated. "There are few activities in our society more personal or private than the passing of urine." *Skinner v. Ry. Labor Exec. Ass'n*, 489 U.S. 602, 617, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (quoting *Nat'l Treasury Emp. Union v. Von Raab*, 816 F.2d 170, 175 (5th Cir. 1987)). The intrusion is not confined to "the limitation on an employee's freedom of movement that is necessary to obtain [ ] blood, urine, or breath samples . . ." *Id.* at 618, 109 S.Ct. 1402. "The ensuing chemical analysis of the sample to obtain physiological data is a further invasion of the tested employee's privacy interests." *Id.* at 616, 109 S.Ct. 1402. However, the character of the intrusion varies along both axes. *See Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 658, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995). Analysis of relevant case law reveals the challenged regime to be relatively noninvasive.

▮▮▮ Applicants are provided advance notice of the drug testing requirement. *See* DE 22-4 at 4 (stating that a notice compliant with Florida Statute § 40.102(3)(a) must be sent to all applicants before testing). Notice of a drug testing requirement is provided on the online applications Plaintiff completed. DE 5-1 at ¶ 6 ('For all applications, I was required to check a box agreeing to be drug-tested . . ."). At her interview, which followed the submission of her online applications, Ms. Friedenberg was instructed to "complete the required

---

**9.** This case is also readily distinguishable from *Scott*. There, the Eleventh Circuit rejected as "hypothetical" broad safety concerns applicable to all state employees, including an office employee "present[ing] a danger when driving a car in the workplace parking lot" or falling prey "to the myriad hazards that exist in the workplace environment (from stacks of heavy boxes, to high stair cases, to files on high shelves, to wet floors, to elevators and escalators)." 717 F.3d 851, 877. Here, the harms presented are specific to the job and context at issue.

drug testing at an approved facility before her new employee orientation." DE 5 at 2. Advance notice counsels against finding undue invasiveness by reducing the "unsettling show of authority" potentially associated with unexpected invasions of privacy. *Nat'l Treasury Emp. Union v. Von Raab,* 489 U.S. at 671, 672 n.2, 109 S.Ct. 1384 (1989) (quoting *Delaware v. Prouse,* 440 · U.S. 648, 657, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)).

 The Court now turns to the sample's production. Urinating is "an excretory function traditionally shielded with great privacy," but the degree of the intrusion depends on the manner in which production is monitored. *Vernonia,* 515 U.S. at 658, 115 S.Ct. 2386 (quoting *Skinner,* 489 U.S. at 626, 109 S.Ct. 1402). Here, as a general rule, testing procedures "shall allow individual privacy unless there is a reason to believe that a particular individual intends to alter or has altered or substituted the specimen to be provided." Fla. Admin. Code R. 59A–24.005(3)(b). "The individual may provide his or her urine specimen in a stall or otherwise partitioned enclosure that allows for individual privacy. The collection site person shall remain in the restroom or area, but outside the stall or partitioned enclosure." *Id.* at 59A–24.005(3)(2). The Supreme Court concluded in *Vernonia* that a policy requiring a monitor to listen for tampering while males produced samples at a urinal and females produced samples in a stall imposed a "negligible" burden on privacy interests because nearly identical conditions characterize public restrooms. 515 U.S. at 658, 115 S.Ct. 2386.

But, if a collection site person "has reason to believe that a particular individual

may alter or has altered or substituted a urine specimen, a higher level supervisor ... shall review the decision and concur in advance with the collection of a second specimen under the direct observation of an observer of the same gender as the donor." Fla. Admin. Code R. 59A–24.005(3)(c)(13). The Supreme Court has only addressed direct observation indirectly—observing that its absence, counsels against deeming a regime . unreasonable. However, the Sixth Circuit upheld a nearly identical requirement in *Knox,* concluding that requiring direct observation only where there is reason to believe the individual will adulterate the sample is not unreasonable. This Court agrees, particularly because "a higher level supervisor" must review and concur in advance with requiring direct observation. Moreover, the record contains no evidence that direct observation is anything but the exception to the rule.

Importantly, the information testing discloses about the state of the applicant's body is limited. Policy 3.96 tests for a specific list of substances.[10] The Supreme Court has deemed it "significant" in *Vernonia* that the test at issue "look[ed] only for drugs, and not for whether the [subject] is, for example, epileptic, pregnant, or diabetic." 515 U.S. at 658, 115 S.Ct. 2386. Safeguards also circumscribe the dissemination of testing-related information. Positive results are reported to the Department of Risk & Benefits Management ("The Department") by e-mail. DE 22–4 at ¶ 17. The information provided is limited. The e-mail states that there was a positive result and notes the substance(s) for which the applicant tested positive or states that the applicant refused, that the applicant

---

**10.** Stating that the District may test for "Alcohol, including a distilled spirit, wine, a malt beverage, or an intoxicating liquor; an amphetamine; a cannabinoid; cocaine; phencyclidine (PCP); a hallucinogen; methaqualone; an opiate or narcotic; a barbiturate; a benzodiazepine; a synthetic narcotic; a designer drug; or a metabolite of any of the substances listed in this subsection." DE 55–2 at 4.

left the test site before completing the test, or that the Medical Review Officer cancelled the test. *Id.* at ¶ 18. No medical information besides the presence of the substances tested for is provided. *Id.* at ¶ 20. This limited information is known to few and is treated as confidential. Only five individuals within the Department are designated to receive applicants' test results. *Id.* at ¶ 16. *See Vernonia*, 515 U.S. at 658, 115 S.Ct. 2386 (emphasizing that "the results of the tests are disclosed only to a limited class of school personnel who have a need to know."); *Earls*, 536 U.S. at 833, 122 S.Ct. 2559 (emphasizing that test results are "released to school personnel only on a 'need to know' basis."). The particular department or school site where the applicant would have worked is informed that the applicant failed to pass a pre-employment medical examination, but not of a positive test result. DE 22-4 at ¶ 19. Results received by the Department are maintained in a confidential electronical medical folder. *Id.* at ¶ 23. Any printed results are shredded. *Id.* at ¶ 24.

Applicants are required, before testing, to disclose medications they are currently taking on a form provided at the testing center. Florida Administrative Code 59A–24.005(2)(g). This information is used to determine whether a positive result is attributable to lawful medications. Plaintiff argues that requiring disclosure *ex ante* is unreasonably invasive. True, more protective alternative measures exist—for example, requiring applicants to disclose their medications only *after* testing positive. The Supreme Court found the intrusiveness of the drug testing scheme in *Von Raab* was reduced, in part, because "an employee need not disclose personal medical information *unless* the test is positive ..." 489 U.S. at 672 n.2, 109 S.Ct. 1384. However, the existence of more protective alternative measures does not render the current scheme unreasonable. On the same day the Supreme Court handed down *Von Raab*, it

upheld the policy in *Skinner*, which required *ex ante* disclosure of any medications the employee has taken in the thirty days preceding the drug test. 489 U.S. at 625 n.7, 109 S.Ct. 1402. *See also Vernonia*, 515 U.S. at 659–60, 115 S.Ct. 2386 (approving a scheme requiring the disclosure of prescription medications in advance of a positive result). The Court emphasized the lack of any indication that the information was not treated as confidential or used for any other purpose. Here, the record demonstrates that test results are kept confidential and not used for any purpose besides screening applicants for employment. Having considered each facet of the drug testing procedure in light of the case law, the Court finds that it is not unduly intrusive.

■ However, the Court does not find that Plaintiff's reasonable expectation of privacy is diminished. "[T]he appropriate inquiry is whether the employee being tested has a diminished expectation of privacy relative to the ordinary government employee because her position depends on physical fitness and judgment." *American Fed'n of State, Cty and Mun. Emp. Council 79 v. Scott*, 717 F.3d 851, 878–879 (11th Cir. 2013). The Eleventh Circuit has interpreted the Supreme Court's cases as being focused on "*physical* or *bodily* privacy, not privacy more broadly conceived." *Id.* Many of the responsibilities with which substitute teachers are tasked, including ensuring students do not hurt themselves in the classroom or elsewhere on campus, preventing or stopping fights between students, and detecting signs of illness or other health episodes and responding promptly and appropriately, have a physical dimension. The Substitute Teacher Handbook specifically instructs substitutes to advise the substitute contact of any limitation or restriction before beginning an assignment so they "will be prepared to

provide safety and accountability for students in any situation and at all times." DE 22-2 at ¶ 16. This, presumably, includes informing the substitute contact of any physical limitations or restrictions. However, this strikes the Court as insufficiently robust to support the conclusion that teachers have a diminished expectation of physical or bodily privacy.

The Court must also consider the nature of Defendant's concerns and the efficacy of the challenged policy in addressing them. The record does not contain particularized evidence of drug abuse by applicants for substitute teaching positions. Of the 4,956 applicants for positions with Defendant instructed to undergo drug testing pursuant to Policy 3.96(8)(a), forty were disqualified by a positive drug test. DE 55-6 at 1. Only thirty-three applicants—0.67% of the total—were disqualified by positive results after actually *completing* drug testing. *Id.*[11] Of those thirty-three disqualified applicants, five had applied for substitute teacher positions. *Id.* Four were disqualified for marijuana and one was disqualified for cocaine. *Id.* The only record evidence of harm having befallen a student because a teacher was impaired is a single instance in which a teacher yelled, made sarcastic commends to a student, and "hit [a] student gently across the arm/chest . . ." DE 55-8 at ¶ 1.

■ But the Supreme Court "has not required a particularized or pervasive drug problem before allowing the government to conduct suspicionless testing." *Earls*, 536 U.S. at 835, 122 S.Ct. 2559. Although a demonstrated problem of drug abuse would "shore up" the need for suspicionless testing by "help[ing] to clarify—and to substantiate—the precise hazard posed by such use," such evidence is not necessary so long as the record supports

the conclusion that the hazards guarded against are "real and not simply hypothetical." *Chandler*, 520 U.S. at 319, 117 S.Ct. 1295. The record contains testimony clarifying and substantiating the hazards posed by impaired substitute teachers. The various responsibilities of substitute teachers discussed above—including detecting and reporting or addressing potential dangers on campuses, such as hazardous conditions; ensuring students do not hurt themselves in the classroom or elsewhere on campus; preventing or stopping fights between students; detecting drug use or possession, or possession of weapons by students; and detecting and reporting students' health issues, such as detecting signs of illness or other health episodes and responding promptly and appropriately—all require awareness and responsiveness to rapidly changing circumstances. DE 22-3 at ¶ 8. It is common sense that impairment would hinder both.

The Court is wary that *Von Raab*—the only case in which the Supreme Court upheld a suspicionless search absent a demonstrated problem of drug abuse—is "[h]ardly a decision opening broad vistas for suspicionless searches" given the "unique context" involved. *Chandler*, 520 U.S. at 321, 117 S.Ct. 1295. This Court finds that substitute teaching, too, is a unique context. *See also Knox*, 158 F.3d at 384. The Supreme Court has variously reiterated the importance of the "custodial and tutelary responsibility" shouldered by public schools. *See Vernonia*, 515 U.S. at 656, 115 S.Ct. 2386; *Earls*, 536 U.S. at 830, 122 S.Ct. 2559. True, the Supreme Court only discussed the public school context with a view toward drug testing *students*, who, by virtue of the custodial and tutelary authority being exercised over

---

11. Seven were deemed positive for refusing to take the test or for leaving the testing site. DE 55-6 at 2-3.

them, had a diminished expectation of privacy. But it would make little sense not to confirm that the substitute teachers charged with fulfilling that critical custodial and tutelary responsibility are not doing so while impaired. The Court concludes that Defendant has a compelling interest in drug testing applicants for substitute teacher positions.

Finally, the Court considers the regime's efficacy, which is a wash. The number of positive results reveals that the sieve of drug testing has not filtered out many drug users. But, according to Defendant, the policy deters drug abusers from applying in the first place. The Supreme Court found, in *Chandler*, that a scheme requiring candidates to schedule a drug test within thirty days of qualifying for placement on the ballot was not a "credible means" for deterring drug users, who could avoid detection by abstaining for a time. 520 U.S. at 320, 117 S.Ct. 1295. *Chandler* distinguished *Von Raab* noting that in the latter case "the applicant for promotion or transfer could not know precisely when action would be taken on the application." *Id.* at n.4 (citing *Von Raab*, 489 U.S. 656, 109 S.Ct. 1384). The Court also emphasized the lack of any reason why drug use in political candidates—who are subject to "relentless scrutiny"—could not be detected equally effectively through observation. *Id.* at 321, 117 S.Ct. 1295.

Here, it is equally true that a job applicant does not know when his or her application will be reviewed. But that uncertainty is not meaningful because applicants who receive a conditional job offer are required to undergo testing before New Employee Orientation, which is set for a date certain. The applicant can simply time his or her drug test by counting backward before setting an appointment. However, substitute teachers are hardly subject to "relentless scrutiny" like that in *Chandler*. There are—to the contrary—rather few

opportunities for observation. On a typical day, a substitute teacher spends between five-and-a-half and six-and-a-half hours working with students in the classroom. DE 22–3 at ¶ 11–14. Teachers, including substitute teachers, are monitored through observation. DE 30–1 at 19:21–25; 20:1–5. But opportunities to observe substitute teachers are relatively limited. Principals have an opportunity to observe substitute teachers when they "check in" at the beginning of the day, DE 30–1 at 19:22–25, to register at the main office and ask a school contact about instructional materials, DE 22–2, Ex. C at ¶¶ 5, 8. The substitute teacher is then given a set of lesson plans and another teacher, an assistant principal, a coach or other support personnel "might" provide additional support by orienting the substitute to the materials and resources for "maybe 10, 15 minutes." DE 30–1 at 46:12–17. The Chief Academic Officer explained that principals may have between fifteen and thirty minutes to observe a substitute teacher in his or her classroom; however, such observation does not always occur. DE 30–1 at 48:7–1.

Ultimately, the Court finds that the balance favors Defendant. Although Plaintiff does not have a diminished expectation of privacy, the drug testing scheme is relatively unintrusive. And although the efficacy of the scheme is not beyond question, the need asserted by Defendant—the protection of the children under a substitute teacher's charge—is compelling indeed.

As noted above, a preliminary injunction is not to be granted unless the movant clearly carries the burden of persuasion as to the four prerequisites, one of which is a likelihood of success on the merits. *Ne. Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990). The Court finds, for the reasons detailed above, that Plaintiff has not shown a likelihood of suc-

cess on the merits. Because Plaintiff is not entitled to a preliminary injunction unless she establishes each of the four prerequisites, the Court need not address whether she has established the remaining three. *See Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002).

## III. CONCLUSION

Plaintiff has not shown a likelihood of success on the merits. Accordingly, Plaintiff's Motion is **DENIED**, but only insofar as Plaintiff seeks to enjoin the application of Policy 3.96(8)(a) to applicants for substitute teacher positions. The Court will, of course, consider argument as to other positions upon an appropriate motion if a class is certified.

**DONE AND ORDERED** in Chambers in Fort Pierce, Florida this 14th day of June, 2017.